Andrew WEISEL, Lorrie Weisel, Cydney Erin, Inc., and A. Weisel and Company Caterers, Inc., Plaintiffs,

v.

Michael PISCHEL, Keith Bierman, Ameri–Swiss Merchant Bancorp, Ltd., a Delaware Corporation, Affiliated Commercial Group, Inc., a Delaware Corporation and Affiliated Bakery Group, Inc., a Delaware Corporation, Defendants.

Michael Pischel and Ameri–Swiss Merchant Bancorp, Ltd., Third–Party Plaintiffs,

v.

Michael Helfer, Third–Party Defendant.

No. CV 98–1233 ADS.

United States District Court, E.D. New York.

Oct. 31, 2000.

Law Offices of Jonathan P. Nelson, P.C., New York City, by Jonathan P. Nelson, of Counsel, for Plaintiffs.

Jeffrey C. Ruderman, Livingston, N.J., for Defendants and Third–Party Plaintiffs, Michael Pischel and Ameri–Swiss Merchant Bancorp Ltd.

Capetola & Doddato, Williston Park, NY, by Robert P. Johnson, of Counsel, for Defendant Keith Bierman.

Elias, Goodman, Shanks & Zizmor, LLP, New York City, by Russell J. Shanks, of Counsel, for Defendant Affiliated Commercial Group, Inc.

Frank Mitchell Corso, P.C., Jericho, NY, by Loraine Falco, of Counsel, for Defendant Affiliated Bakery Group, Inc.

Jaspan Schlessinger Hoffman, LLP, Garden City, NY, by Lisa M. Golden, for Third–Party Defendant Michael Helfer.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

This lawsuit arises from the claims of Andrew Weisel ("Weisel"), Lorrie Weisel, Cydney Erin, Inc. ("Cydney Erin"), and A. Weisel and Company Caterers, Inc. ("WCC") (collectively, the "plaintiffs") that Michael Pischel ("Pischel"), Ameri–Swiss Merchant Bancorp, LTD ("Ameri–Swiss"), Keith Bierman ("Bierman"), Affiliated Commercial Group, Inc. ("ACG"), and Affiliated Bakery Group, Inc. ("ABG") (collectively, the "defendants"), devised, conducted, and or participated in a "loan-sharking scheme" in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). *See* 18 U.S.C. §§ 1962(b), 1962(c), and 1962(d). The plaintiffs also allege state law claims for conversion, intentional infliction of emotional distress, tortious interference with a contract, and breach of an employment contract. Presently before this Court is Pischel and Ameri–Swiss' motion for summary judgment, seeking to dismiss the plaintiffs' complaint, pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ.P."). Also before this Court is the plaintiffs' motion to vacate the default taken against them for failing to answer the counterclaims raised by defendants Pischel and Ameri–Swiss.

## I. BACKGROUND

Weisel is the president and sole shareholder of WCC and Cydney Erin. The latter company is a manufacturer and wholesaler of baked goods. Lorrie Weisel is married to Weisel. Pischel is the sole shareholder, officer, and director of Ameri–Swiss, which provides consulting services and equipment leases.

On March 11, 1997, Pischel loaned the sum of $50,000 to the plaintiffs WCC and Cydney Erin, and Weisel, acting on behalf of those two companies, executed and delivered to Pischel a promissory note, agreeing to repay the principal sum of $50,000 plus interest at the rate of 18% per annum. The note included a default interest rate of 22% per annum. The payments under the note were due in

eight (8) weekly installments commencing seven days from the date of the note.

On the same date, on behalf of WCC and Cydney Erin, Weisel signed a consulting agreement with Ameri–Swiss, whereby Weisel agreed to hire Ameri–Swiss as a financial consultant for a fee of $7,000. By the time the loan agreement was signed, Weisel had paid Ameri–Swiss the sum of $3,000 in partial payment for the consulting services the company had allegedly provided. The remainder of the fee was never paid. The services to be performed by Ameri–Swiss included financial consulting and advisory services and assistance in accounting and obtaining additional financing. Although the consulting agreement was signed on March 11, 1997, its term commenced in January 1997, and continued through December 31, 1997. The terms of the agreement prohibited Weisel from terminating it before he repaid the promissory note in full.

According to Weisel, Pischel would not lend him any money unless Weisel signed the consulting agreement; neither Ameri–Swiss nor Pischel provided him, Cydney Erin, or WCC with any consulting services between January 1997 and March 11, 1997; and neither Ameri–Swiss nor Pischel provided him, Cydney Erin, or WCC with consulting services after March 11, 1997. On the other hand, Pischel and Ameri–Swiss, contend that consulting services were performed.

On March 11, 1997, Weisel also executed a pledge agreement that secured his stock in Cydney Erin and WCC as collateral for the loan. In addition, he signed documents whereby he and his wife, Lorrie, personally guaranteed the loan, and he executed confessions of judgment in favor of Pischel and Ameri–Swiss.

On or about April 1, 1997, Weisel presented Pischel with a check in the amount of $6,769, which represented the first payment on the loan. Pischel attempted to deposit the check, but the bank returned it for insufficient funds. On or about April 18, 1997, Pischel sent Weisel notice that the loan was in default. In that notice, Pischel also asked for Weisel's consent to allow him to organize a system within Weisel's businesses to ensure repayment of the note. Weisel refused to agree to the organization of such a system, interpreting Pischel's offer as an attempt to gain inside information about Cydney Erin's business, potential in order to funnel money out of Cydney Erin and into accounts held by Pischel and Ameri–Swiss.

Following the default on the Note, Weisel sought the legal services of his, long-time friend, and third-party defendant, Michael Helfer ("Helfer"). Helfer arranged for Weisel to make payments to Helfer's attorney trust account. Helfer made four payments to Pischel in repayment of the note, each in the amount of $2500, from his trust account.

On April 25, 1997, Pischel and Bierman, a chiropractor and investor, incorporated ACG and became its majority shareholders.

In June 1997, Bierman and Weisel, who was acting as president of Cydney Erin and WCC, executed a factoring agreement that was managed by Pischel. The agreement provided that Bierman would factor Cydney Erin's account receivables in exchange, for factoring and finance fees.

The plaintiffs allege that Pischel, not Bierman, took control of Cydney Erin's account receivables. The plaintiffs further assert that Pischel was involved in purchasing the receivables, remitting payments to Weisel and Cydney Erin, and keeping an accounting of the money owed to Weisel for factored invoices. The plaintiffs also allege that Pischel forced Weisel to open a bank account that was held jointly by Cydney Erin and Pischel, and that any payments made to Cydney Erin were deposited into that account. The plaintiffs claim that Pischel failed to advance the proper payments to Weisel and Cydney Erin in consideration of the account receivables and failed to pay Weisel and Cydney Erin the proper amount due to them for the purchase of the receivables.

The defendants claim that during the factoring period, Pischel and Ameri–Swiss did not accept distributors' orders on Cydney Erin's behalf; did not order inventory or supplies on Cydney Erin's behalf; did not decide Cydney Erin's employment issues; and did not prevent Cydney Erin from seeking additional financing. The defendants

also assert that the factor realized a loss from the factoring agreement. The defendants further claim that any money withdrawn from any accounts by the factor or his agent, Pischel, was withdrawn to repay the initial capitalization of the factoring. According to the defendants, neither Pischel nor Ameri–Swiss used, controlled, or operated Cydney Erin to loan funds to any entity.

It is undisputed that the factoring agreement did not generate sufficient funds to pay any portion of the original note from Weisel to Pischel. The plaintiffs claim that Pischel purportedly used the indebtedness to continue to exert control over the plaintiffs by prohibiting the funds generated by the factoring agreement to satisfy the note.

During August 1997, Cydney Erin became unable to meet all of its financial obligations and ceased doing business.

In late August 1997, Weisel, Pischel, and Louis Restivo ("Restivo") signed a "Preliminary Term Sheet" that was dated August 21, 1997. The Preliminary Term Sheet outlined the formation of a new corporation and stated that "the Pischel Group" would invest $250,000 of capital in the new corporation, and that Weisel and Restivo would contribute the trade name, "Sweet Endings," to the company. The Preliminary term Sheet further provided that, in return, members of the Pischel Group were to receive 100% of the corporation's preferred stock, and Weisel and Restivo were to receive 50% of the common stock.

Weisel gave ABG, the new corporation, Cydney Erin's inventory and equipment, expecting to receive shares of common stock in return.

On August 27, 1997, ABG was incorporated with ACG, Darcy Restivo, Darren Restivo (collectively, "the Restivos") and Helfer as its shareholders. The "Securitiesholders Agreement" stated that ACG put up a $250,000 capital contribution, including $30,000 of equipment, and that the Restivos and Helfer contributed the rights to the use and ownership of the name "Sweet Endings." The Securitiesholders Agreement also stated that ACG owned 5,000 shares of preferred stock; the Restivos and Helfer each owned 2,500

shares of commons stock; Pischel was the president and treasurer; and Bierman was the secretary of the new corporation. The shares that Weisel should have received were issued to Helfer.

Although Weisel was not made one of ABG's shareholders, he was given a three-year employment contract and became the bakery's director of operations, earning an annual salary of $70,000. The employment contract provided that Weisel could be terminated for cause upon a duly adopted majority vote of ABG's Board of Directors.

In a letter dated August 28, 1997, Pischel informed Weisel that he, Lorrie Weisel, Cydney Erin, and WCC owed him an aggregate sum of $148,000, which represented the principal, interest, and penalties on the promissory note. Pischel's letter warned Weisel that failure to pay the entire amount would result in Pischel foreclosing on the collateral, pursuing his rights under the personal guarantees, and enforcing any or all contract rights against Weisel, his wife, and his corporate entities. Pischel informed Weisel of the letter's true purpose, which was to shield ABG from Cydney Erin's creditors. Weisel disputed the amount that Pischel claimed was due.

When ABG began operations in September 1997, it was using Cydney Erin's equipment, remaining inventory, and trade name. The plaintiffs claim that ABG acquired Cydney Erin's client base, without compensating Cydney Erin or Weisel. According to the plaintiffs, ABG's representatives told Cydney Erin's distributors that ABG had foreclosed on Cydney Erin but that ABG would be willing to provide them with services identical to those of Cydney Erin. The defendants contend that ABG did not make any misrepresentations to any of Cydney Erin's distributors to induce them to cease business with Cydney Erin and to commence the same business with ABG.

During a meeting of ABG's Board of Directors, held on January 10, 1998, the Board voted to fire Weisel for allegedly applying for a bank loan against the assets of ABG and for making false statements to that bank regarding ABG and Cydney Erin.

ABG was unable to sustain operations and dissolved in June 1998, resulting in a loss of the capital invested.

The plaintiffs claim that defendants Pischel and Ameri–Swiss are in the business of lending money at usurious rates. On the other hand, Pischel and Ameri–Swiss, contend that they have never loaned money at rates in excess of the maximum lawful rate. Pischel has loaned money to approximately five companies for which Ameri–Swiss has done consulting. Any consulting agreements that were executed at the same time of the loans reflected actual consulting services performed for the fees paid.

The plaintiffs' complaint alleges ten causes of action. The first two causes of action allege substantive RICO violations by all of the defendants. The third and fourth causes of action are RICO conspiracy claims made against all the defendants. In their fifth cause of action, the plaintiffs allege conversion by Pischel and Ameri–Swiss of assets "including but not limited to account receivables and money paid by distributors, belonging to CYDNEY ERIN and/or WEISEL." The sixth cause of action has been dismissed by stipulation of the parties. The seventh cause of action alleges conversion by ABG of "machinery, ingredients, name, client base and goodwill belonging to WEISEL and/or CYDNEY ERIN." In their eighth cause of action, the plaintiffs claim that ABG breached Weisel's employment contract. The ninth cause of action asserts that Weisel and Lorrie Weisel suffered severe emotional distress as a result of the extremely outrageous conduct by Pischel, Ameri–Swiss and Bierman. The tenth cause of action alleges that ABG tortiously interfered with existing and prospective contracts between Weisel and Cydney Erin and their distributors.

On July 17, 1998, ABG and Bierman filed their answer. ABG and Bierman asserted three cross-claims against Pischel, Ameri–Swiss, and ACG, claiming that (1) if the plaintiffs suffered damages, those damages were the fault of Pischel, Ameri–Swiss and ACG; (2) if the plaintiffs recover against any defendants, then ABG and Bierman are entitled to an apportionment of responsibility for the damages; and (3) if the plaintiffs recover,

then ABG and Bierman are entitled to full indemnification from Pischel, Ameri–Swiss, and ACG.

On January 8, 1999, Pischel and Ameri–Swiss filed a third-party complaint against Helfer demanding indemnification or proportionate contribution from Helfer in the event of recovery by the plaintiffs.

In papers dated February 26, 1999, defendants Pischel and Ameri–Swiss moved, pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ.P.") 15(a), to amend their answer and to assert three counterclaims against the plaintiffs, which motion was opposed by the plaintiffs. On March 19, 1999, the Court granted the motion to amend by Pischel and Ameri–Swiss and allowed them to file an amended answer asserting three counterclaims. On April 16, 1999, defendants Pischel and Ameri–Swiss filed their amended answer.

In papers dated May 6, 1999, the plaintiffs moved to dismiss the defendants' third counterclaim for failing to state a claim under Fed.R.Civ.P. 12(b)(6) or for failing to meet the pleading requirements of Fed.R.Civ.P. 9(b). In a decision, dated December 18, 1999, the Court granted the plaintiffs' motion and dismissed Pischel and Ameri–Swiss' third counterclaim, pursuant to Fed.R.Civ.P. 9(b), without prejudice and with leave to re-file.

On February 24, 2000, defendants Pischel and Ameri–Swiss re-filed their counterclaims, amending the third one. In their first counterclaim, the defendants allege that WCC and Cydney Erin are liable for payment due under the promissory note. The second counterclaim alleges that Weisel and Lorrie Weisel are liable for the payment due under the promissory note as guarantors of the note. In their third counterclaim, the defendants allege fraud and misrepresentation in Weisel's initial application for the loan.

On January 27, 2000, the defendants Pischel and Ameri–Swiss served the summary judgment motion that will be addressed in this opinion. Due to the January 1, 2000 revisions in this Court's individual rules, the Court denied the plaintiffs' February 16, 2000, application for an extension of time in

which to oppose the defendants' motion. However, the defendants agreed to withdraw their motion and re-serve on March 22, 2000, giving the plaintiffs an approximate total of two months to serve and file their opposition. In a letter to the Court, dated April 7, 2000, counsel for defendants Pischel and Ameri–Swiss informed the Court that they had not received the plaintiffs' opposition to their motion and requested that the motion be considered unopposed. The defendants' attorney also pointed out that the plaintiffs, who had been served with the amended counterclaims on February 25, 2000, had not filed an answer nor made a request for an extension of time in which to answer the amended counterclaims. Counsel requested that the Court provide a date by which the plaintiffs must seek an extension to file their answer.

On April 10, 2000, the Court received a letter from the plaintiffs' attorney, requesting an extension of time to April 17, 2000, to serve and file his opposition to the summary judgment motion. In a decision, dated April 13, 2000, the Court held that although the plaintiff was in default for not having filed opposition papers, the Court would "not punish the plaintiffs for the conduct of their attorney." Accordingly, the Court granted the plaintiffs request for an extension of time to file their opposition to the summary judgment motion, to April 17, 2000, and the Court also directed that counsel pay a sanction of $500 to counsel for the defendants. In addition, the Court granted the defendants' request with respect to the amended counterclaims and directed the plaintiffs to seek an extension by April 17, 2000, or they would be deemed in default. The Court's order also noted that on April 13, 2000, counsel for the parties had been advised of the substance of the Court's order by telephone.

In a letter dated April 17, 2000, counsel for defendants Pischel and Ameri–Swiss informed the Court that as of the end of business that day, he had not been served with the plaintiffs' opposition papers or with a request for an extension to file an answer to the defendants' counterclaims. The defendants' attorney again requested that his motion be considered unopposed. Counsel also stated that he would be sending the Clerk of

the Court a request to enter a default on the amended counterclaims. On April 18, 2000, the Court granted the defendants' request to have their motion be considered unopposed.

In papers filed in this Court on April 21, 2000, the defendants requested that the Court enter the default of the plaintiffs for failure to reply, answer, or otherwise defend the amended counterclaims. On April 21, 2000, the Clerk of the Court entered a default against the plaintiffs with respect to the defendants' counterclaims. In papers dated April 17, 2000, and filed with this Court on April 21, 2000, the plaintiffs answered the defendants' counterclaims.

In a letter, dated May 2, 2000, counsel for the plaintiffs requested a nunc pro tunc extension of time to answer defendants' counterclaims. Counsel informed the Court that prior to receiving the Court's April 13, 2000, order, he believed that the plaintiffs had already been granted an extension of time to file their answer via a telephone conversation with the Court. The plaintiffs' attorney explained that he "inadvertently neglected to file an answer," and argued that because the defendants had already received his answer, they had not been prejudiced by the delay. In a letter, dated May 3, 2000, the defendants opposed the plaintiffs' request for an extension. The defendants noted that although the plaintiff had stated that he believed that the Court had given him until April 17, 2000, to file an answer, the plaintiffs' attorney failed to explain why neither an answer nor a request for an extension to file one was filed until April 21, 2000. Counsel for the defendants also asserted that the plaintiffs' letter did not address Fed.R.Civ.P. 6(b)(2), and failed to meet the standard of "excusable neglect" which is required by the Rule.

In a letter, dated May 9, 2000, the Court informed counsel for both parties that it had noted the default of the plaintiffs with regard to an answer to the defendants Pischel and Ameri–Swiss' counterclaims. The Court informed the parties that if the plaintiff wished to vacate the entry of the default, a formal motion must be made within twenty days of the date of the letter. In papers dated May 22, 2000, and filed in this Court on May 23,

238

2000, the plaintiffs moved to vacate their default. That brings us up to date.

Presently before this Court are the motion by Pischel and Ameri–Swiss for summary judgment and the plaintiffs' motion to vacate their default for failing to answer the counterclaims of the defendants Pischel and Ameri–Swiss.

## II. *DISCUSSION*

### A. Plaintiffs' Motion to Vacate Their Default

#### 1) Standard for Motions to Vacate Entry of Default

▅▅▅ Federal Rule of Civil Procedure 55(c) provides that "[f]or good cause shown the court may set aside an entry of default and, if a judgment by default has been entered, may likewise set it aside in accordance with Rule 60(b)." Relief from default under Rule 55(c) is to be granted at the discretion of the court upon consideration of the individual circumstances of the case and the credibility and good faith of the parties. *See Enron Oil Corp. v. Diakuhara,* 10 F.3d 90, 95 (2d Cir.1993). In determining a motion to vacate a default, the court focuses on three considerations with regard to the meaning of "good cause." These factors are: (1) the willfulness of the default; (2) the potential prejudice to the adversary; and (3) the presentation of a meritorious defense. *See Chalasani v. Chalasani,* 92 F.3d 1300, 1307 (2d Cir.1996) (citing *In re Men's Sportswear, Inc.,* 834 F.2d 1134, 1138 (2d Cir.1987)); *American Alliance Ins. Co., Ltd. v. Eagle Ins. Co.,* 92 F.3d 57, 59 (2d Cir.1996); *Enron Oil,* 10 F.3d at 96. Other equitable factors that may be considered include whether the failure to follow a rule of procedure was a mistake made in good faith and whether the entry of default would bring about an unfair result. *See Enron Oil,* 10 F.3d at 96.

The Second Circuit strongly prefers dispute determination on the merits and directs district courts to resolve any doubts regarding vacatur of a default in favor of a trial on the merits. *See Shah v. New York State Dept. of Civil Service,* 168 F.3d 610, 615 (2d Cir.1999); *Cody v. Mello,* 59 F.3d 13, 15 (2d Cir.1995); *Enron Oil Corp. v. Diakuhara,* 10 F.3d 90, 95 (2d Cir.1993). Indeed, that Court has recognized that "dismissal is a harsh remedy to be utilized only in extreme situations." *Cody,* 59 F.3d at 15 (internal quotations omitted).

#### a) Willfulness

In *American Alliance,* the Second Circuit explained that a default caused by a filing mistake on the part of the defendant's in-house counsel is not "willful" for the purposes of cases interpreting Rule 60(b)(1). *See American Alliance,* 92 F.3d at 61. The rationale for this holding was that the Court "s[aw] no reason to expand [its] willfulness standard to include careless or negligent errors in the default judgment context." *Id.* The Second Circuit clarified its willfulness standard in *Gucci America, Inc., Guess?, Inc. v. Gold Center Jewelry,* 158 F.3d 631, 634–35 (2d Cir.1998), in which it held that "while a determination that the defendant acted in bad faith would certainly support a finding of 'willfulness,' it is sufficient that the defendant defaulted deliberately." *Id.*

▅▅▅ Application of these standards reveals that this is a borderline case, because the conduct of the plaintiffs' attorney came close to being deliberate. At the very least, the plaintiffs' attorney was negligent in handling this matter. At worst, counsel displayed a cavalier attitude toward the Court and the seriousness of these proceedings.

In this regard, the Court notes that the plaintiffs' answer to the amended counterclaims was due on March 24, 2000. *See* Fed.R.Civ.P. 12(a)(2). However, it was not until April 10, 2000, after the defendants had informed the Court that they had not received the plaintiffs' answer, that the Court received the plaintiffs' request for an extension of time to file their answer. Even after receiving an extension of time to file a request for an extension or an answer, the plaintiffs still failed to file either in a timely manner. Although the plaintiffs claim that a miscommunication with the Court led them to believe that an answer, not a request for an extension, was due by April 17, 2000, this argument does not explain why neither an answer nor a request for an extension was filed by that date. Furthermore, the plain-

tiffs never filed papers in opposition to the defendants' motion for summary judgment, which this Court is thus considering unopposed with regard to the submitted papers. However, the Court permitted the plaintiffs' attorney oral argument in opposition to the motion and considered those arguments in rendering this decision.

Despite counsel's obvious neglect, he eventually filed an untimely answer which the Court received only four days after their request for an extension was due. Also, significantly, prior to the plaintiffs' lapse in the prosecution of their case, they had filed, among other things, a motion in opposition to the defendants' request to amend their answer and had moved to dismiss the third counterclaim. In fact, the plaintiffs were successful in dismissing the third counterclaim. Moreover, the plaintiffs moved expeditiously, as there was little delay between the entry of default on April 21, 2000, and the plaintiffs' motion to vacate that default on May 23, 2000. In addition, it appears that the plaintiffs had every intent of opposing the motion for summary judgment, because they had exchanged Rule 56.1 Statements with the defendants as is required by this Court's Individual Rules. However, the Court is concerned about the dilatory practice in which the plaintiffs' attorney has engaged, which is why the Court considered the summary judgment motion unopposed, except for oral argument, and why the Court has previously sanctioned plaintiffs' attorney.

Nevertheless, giving the plaintiffs' attorney the benefit of the doubt, a generous review of the affidavit submitted permits the conclusion that a confluence of factors, including laxness and negligence, was to blame for counsel's default. Thus, bearing in mind the strong preference for resolution of disputes on the merits, the Court concludes that, counsel's conduct does not display the kind of "willfulness" or "bad faith" contemplated in *American Alliance*.

#### b) Prejudice

The Court also concludes that no prejudice will result if the default judgment is vacated. The plaintiffs promptly made the instant motion several weeks after the default was entered. During that period, no evidence was or destroyed, and no witnesses became unavailable or lost their memory regarding pertinent events. *See Davis v. Musler*, 713 F.2d 907, 916 (2d Cir.1983); *Time Warner Cable of N.Y. v. Cabada*, 1997 WL 797533, at *2 (E.D.N.Y.1997).

#### c) Meritorious Defense

The Second Circuit has stated that a "defense is meritorious if it is good at law so as to give the fact-finder some determination to make." *American Alliance*, 92 F.3d at 61. "Likelihood of success is not the measure. [Plaintiffs'] allegations are meritorious if they contain 'even a hint of a suggestion' which, if proven at trial, would constitute a complete defense." *Keegel v. Key West & Caribbean Trading Co., Inc.*, 627 F.2d 372, 374 (D.C.Cir.1980); *see also Enron Oil*, 10 F.3d at 98. Without going into all the details of the plaintiffs' alleged defenses to the counterclaims, the Court finds that the plaintiff has made such a showing. The first two counterclaims seek payment allegedly due under the promissory note, but the plaintiffs maintain that the note is usurious and unenforceable. In addition, the plaintiffs deny that Weisel engaged in fraud and misrepresentation when he initially applied for the loan. In view of these factors, the Court concludes that the plaintiffs have stated a meritorious defense to all three counterclaims.

In sum, the Court finds that it is appropriate to vacate the default. Accordingly, the plaintiffs' motion is granted to the extent that their default in answering the counterclaims is vacated.

### B. Defendants' Motion for Summary Judgment

#### 1) Summary Judgment Standard

A court may grant summary judgment "only if the pleadings and evidentiary submissions demonstrate the absence of any genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Tasini v. New York Times Co.*, 192 F.3d 356, 360 (2d Cir.1999); *see also Hunt v. Cromartie*, 526 U.S. 541, 119 S.Ct. 1545, 1550, 143 L.Ed.2d 731 (1999) (citing *Celotex*

240

Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 [1986]; *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 [1986] ); *Turner v. General Motors Acceptance Corp.*, 180 F.3d 451, 453 (2d Cir.1999); Fed.R.Civ.P. 56(c). In this determination, the Court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the party opposing the motion. *See Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir.1998); *Tasini*, 192 F.3d at 360; *Twin Lab., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 568 (2d Cir.1990).

According to the Second Circuit, "[s]ummary judgment is a tool to winnow out from the trial calendar those cases whose facts predestine them to result in a directed verdict." *United National Ins. Co. v. The Tunnel, Inc.*, 988 F.2d 351, 355 (2d Cir.1993). Once a party moves for summary judgment in order to avoid the granting of the motion, the non-movant must come forward with specific facts showing that a genuine issue for trial exists. *See Fagan v. New York State Elec. & Gas Corp.*, 186 F.3d 127, 132 (2d Cir.1999); *West–Fair Elec. Contractors v. Aetna Cas. & Surety Co.*, 78 F.3d 61, 63 (2d Cir.1996); *see also, Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir.1990) (quoting Fed.R.Civ.P. 56[e] ). A genuine issue of material fact exists if "a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. 2505, 91 L.Ed.2d 202.

However, mere conclusory allegations, speculation, or conjecture will not avail a party resisting summary judgment. *See Kulak v. City of New York*, 88 F.3d 63, 70 (2d Cir.1996). If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the nonmovant, summary judgment is unavailable. *Holt v. KMI–Continental, Inc.*, 95 F.3d 123, 129 (2d Cir.1996), *cert. denied*, 520 U.S. 1228, 117 S.Ct. 1819, 137 L.Ed.2d 1027 (1997); *Rattner v. Netburn*, 930 F.2d 204 (2d Cir. 1991); *Grain Traders, Inc. v. Citibank, N.A.*, 160 F.3d 97, 100 (2d Cir.1998). Finally, the Court is charged with the function of "issue finding," not "issue resolution." *Gallo v. Prudential Residential Services*, 22 F.3d 1219, 1224 (2d Cir.1994).

**2) The Substantive RICO Claims**

RICO grants a private right of action to "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." 18 U.S.C. § 1964(c). Section 1962, in turn, makes it unlawful "(1) to use 'income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt,' in the operation of any enterprise whose activities affect interstate commerce, 18 U.S.C. § 1962(a); or (2) to participate, as a person employed by or associated with an enterprise whose activities affect interstate commerce in the conduct of the enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt, *id.* § 1962(b); or (3) to conspire to violate the foregoing provisions, *id.* § 1962(d)." *Durante Bros. and Sons, Inc. v. Flushing National Bank*, 755 F.2d 239, 245–46 (2d Cir.1985), *cert. denied*, 473 U.S. 906, 105 S.Ct. 3530, 87 L.Ed.2d 654 (1985); *see Sundance Land Corp. v. Community First Federal Savings and Loan Ass'n*, 840 F.2d 653, 665 (9th Cir.1988).

An "unlawful debt" is a debt that is "unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury," 18 U.S.C. § 1961(6)(A), and that was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6)(B). *See Durante Bros.*, 755 F.2d at 246; *see also Sundance Land Corp.*, 840 F.2d at 665. Unlawful debts are debts that are usurious under the state's civil usury or banking laws, but that do not necessarily violate the state's criminal usury laws. *See Durante Bros.*, 755 F.2d at 246. Currently under New York law, a loan to an individual need only bear an interest rate higher than 16% per annum to be unenforceable. *See* General Obligations Law § 5–501(2); Banking Law § 14–a; *Cohen v. Eisenberg*, 265 A.D.2d 365, 366, 697 N.Y.S.2d 625 (2d Dept.1999); *see also Durante Bros.*, 755 F.2d at 246. However, a loan to a corporation is unenforceable only when it bears an interest rate in excess of 25% per annum.

*See* N.Y. General Obligations Law §§ 5–501(2), 5–521(3); N.Y. Penal Law § 190.40.

■ This case presents a series of garden variety business transactions, including a loan, a consulting agreement, and the formation of a new company, that has been magically transformed into a RICO case. The Court finds that summary judgment must be granted dismissing the substantive RICO claims, counts one and two of the complaint, as against Pischel and Ameri–Swiss. To succeed on both counts the plaintiffs must prove, among other things, that the defendants collected an unlawful debt, which, in turn, requires that the plaintiffs show (1) that the debt was unenforceable under state or federal usury laws; (2) that the debt carried twice the enforceable interest rate; and (3) that the debt was incurred in connection with the defendants' business of lending money at a usurious rate. *See Durante Bros.,* 755 F.2d at 248; *see also Sundance Land Corp.,* 840 F.2d at 666.

This Court finds that there are genuine issues of material fact regarding whether the loan was unenforceable under New York's usury laws and whether the debt carried twice the enforceable interest rate. It is undisputed that Pischel loaned WCC and Cydney Erin $50,000 at an interest rate of 18% per annum. Because Pischel loaned money to corporations as opposed to individuals, the maximum interest rate the law permits on his loan was 25%. *See* N.Y. General Obligations Law §§ 5–501(2), 5–521(3); N.Y. Penal Law § 190.40. Although the 18% rate of interest appears to be enforceable on its face, the plaintiffs assert that because neither Pischel nor Ameri–Swiss ever provided consulting services, the $7,000 consulting fee constituted "points" on the loan raising the rate of interest from 18% to 108.5% per annum. In opposition, the defendants allege that the charge of $7,000 was a fee for consulting services actually rendered and did not constitute "points" affecting the calculation of interest on the loan. Therefore, according to the defendants, the loan was enforceable because it carried an interest rate of 18%. Whether the $7,000 fee was paid in exchange for consulting services is a genuine issue of material fact because it determines the interest rate of the loan and its enforceability, two facts that the plaintiffs must establish to prevail.

■ Nevertheless, summary judgment must be granted on the substantive RICO claims, because on the pleadings and evidentiary submissions presently before the Court, the plaintiffs will be unable to prove that the defendants were in the business of lending money at usurious rates. RICO's legislative history, specifically discussing the concept of a "pattern" of racketeering activity and a usurious rate that was twice the enforceable rate, suggests that the "'[t]he target of [RICO] is ... not sporadic activity,'" *Durante Bros.,* 755 F.2d at 250 (quoting S.Rep. No. 91–617, 91st Cong., 1st Sess. 158 (1969)); and that its application should be limited "to cases of clear 'loan-sharking.'" *Id.* (quoting S.Rep. No. 91–617, 91st Cong., 1st Sess. 158 (1969)). The requirement that the loan have been incurred in connection with "the business of" making usurious loans is aimed at the same goal, i.e., "the exclusion from the scope of the statute of occasional usurious transactions by one not in the business of loan sharking." *Id.*

Here, the complaint alleges only that Pischel and Ameri–Swiss were "in the business of lending money at a usurious rate" (*see* complaint, ¶¶ 74, 82, 90, 98). However, at no point in the complaint, or in any other document submitted to the Court, do the plaintiffs describe other individuals or companies to whom Pischel and Ameri–Swiss lent money or the usurious interest rates attached to any other loan by the defendants. Moreover, even after the plaintiffs obtained documents pertaining to other loans made by Pischel in which Ameri–Swiss provided consulting services, the plaintiffs still failed to provide the Court with facts that would substantiate their single conclusory allegation that Pischel and Ameri–Swiss were in the business of lending money at usurious rates.

As noted above, the Court permitted counsel for the plaintiffs to argue in opposition to the motion for summary judgment even though the court considered the motion papers unopposed. At oral argument, the Court specifically asked counsel whether he could present any specific evidence to the

Court that would show that the defendants had loaned money to other individuals or corporations at usurious rates. Counsel said that he had obtained the documents for three loan agreements which showed that Pischel had loaned money to various persons and that Ameri–Swiss had provided consulting services to those debtors. However, counsel stated that he neither had affidavits from any of those debtors nor had he deposed them. Thus, counsel was unable to provide the Court with any evidence that Pischel loaned money to others at usurious rates.

As such, the plaintiffs' papers and position "give[ ] no promise that [they] will be able to establish that [Pischel and Ameri–Swiss] were engaged in 'the business of' making usurious transactions." *Durante Bros.*, 755 F.2d at 250. Their conclusory allegation to the contrary is insufficient to resist summary judgment. *See Kulak v. City of New York*, 88 F.3d 63, 70 (2d Cir.1996). Accordingly, the Court grants the motion of Pischel and Ameri–Swiss for summary judgment dismissing Counts One and Two, the substantive RICO claims.

### 3) The RICO Conspiracy Claims

The plaintiffs allege, in the third and fourth counts, violations of section 1962(d), which prohibits any conspiracy to commit a RICO violation. The RICO conspiracy claims largely incorporate the substantive RICO claims. For the reasons stated above, the plaintiffs are unable to make out a substantive RICO claim. Accordingly, the RICO conspiracy claims against Pischel and Ameri–Swiss are dismissed as well. *See Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3rd Cir.1993) ("Any claim under § 1962(d) based on conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient."); *Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*, 2000 WL 1346152 *39 (E.D.N.Y. Sept. 19, 2000) ("Under the law of this circuit, a claim under section 1962(d) alleging a conspiracy to violate the other subsections fails as a matter of law if the substantive claims based on the other subsections are defective."); *Piccone v. Board of Directors*, 2000 WL 1219391 *7 (S.D.N.Y. Aug. 28, 2000);

*Economic Opportunity Comm'n of Nassau, Inc. v. County of Nassau, Inc.*, 47 F.Supp.2d 353, 367 (E.D.N.Y.1999).

In view of the foregoing, the Court need not address the defendants' remaining arguments in favor of granting summary judgment with respect to the plaintiffs' RICO and RICO conspiracy claims. Defendants Pischel and Ameri–Swiss' motion for summary judgment dismissing the substantive RICO claims and the RICO conspiracy claims is granted.

### 4) The Conversion Claim

■ In their fifth cause of action, the plaintiffs claim that Pischel and Ameri–Swiss, "with the intent to exercise dominion or control, wrongfully took, obtained, withheld, and otherwise converted assets to their own use, including but not limited to account receivables and moneys paid by distributors, belonging to CYDNEY ERIN and/or WEISEL." To be successful on a conversion cause of action, the plaintiff must prove " 'unauthorized exercise of dominion or control over property by one who is not the owner of the property which interferes with and is in defiance of a superior possessory right of another in the property.' " *Steinmetz v. Toyota Motor Credit Corp.*, 963 F.Supp. 1294, 1306 (E.D.N.Y.1997) (quoting *Meese v. Miller*, 79 A.D.2d 237, 436 N.Y.S.2d 496, 500 (4th Dept. 1981)). Pischel and Ameri–Swiss claim that the plaintiffs will be unable to raise any genuine issue of fact by which a jury might conclude that the defendants converted Cydney Erin's assets because the parties dismissed by stipulation the claim that Pischel and Ameri–Swiss collected Cydney Erin's receivables without providing adequate compensation. In a stipulation and order dated February 5, 1999, the parties agreed to dismiss the sixth cause of action alleging breach of the factoring contract by Pischel, Ameri–Swiss, and Bierman. This stipulation does not necessarily determine the issue of whether Pischel and Ameri–Swiss provided adequate compensation for Cydney Erin's receivables as a matter of law.

■ Moreover, even if the stipulation established an admission that Pischel and Ameri–Swiss provided adequate compensation

for the account receivables, this Court would still deny summary judgment, because the plaintiffs' claim of conversion is not limited to the factoring agreement but also includes the assertion that Pischel and Ameri–Swiss used Cydney Erin's ingredients, recipes, machinery, name and goodwill to create ABG without properly compensating Cydney Erin. In support of that claim, the plaintiffs argue that Weisel should have been a shareholder of ABG but was ultimately excluded from the shareholders agreement. The plaintiffs further argue that Weisel's termination from his salaried position at ABG completed the takeover of Cydney Erin.

Pischel and Ameri–Swiss controvert these allegations, contending that Weisel willingly and intentionally gave them Cydney Erin's machinery, remaining inventory, and trade name in anticipation of receiving shares of ABG. Pischel and Ameri–Swiss further assert that Weisel did not receive shares of ABG, because Pischel, Bierman, and the Restivos did not want Cydney Erin's creditors to look to ABG to satisfy the Cydney Erin or Weisel's debts. Pischel and Ameri–Swiss explain that, therefore, Helfer was issued Weisel's shares, and that Weisel was given a job at ABG instead. Pischel and Ameri–Swiss further argue that Weisel was fired for applying for a bank loan against ABG's assets.

Whether Pischel and Ameri–Swiss converted Cydney Erin's account receivables, machinery, ingredients, goodwill, remaining inventory, and trade name are all disputed material factual issues for the jury to determine. Therefore, Pischel and Ameri–Swiss' motion for summary judgment with regard to the cause of action alleging conversion is denied.

### 5) The Intentional Infliction of Emotional Distress Claim

The Court finds that the conduct complained of does not constitute the kind of outrageous conduct necessary to support this cause of action. Liability for the tort of intentional infliction of emotional distress requires "extreme and outrageous conduct, which so transcends the bounds of decency as to be regarded as atrocious and intolerable in a civilized society." *Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 143, 490 N.Y.S.2d 735, 741, 480 N.E.2d 349 (1985); *see Murphy v. American Home Prods. Corp.*, 58 N.Y.2d 293, 461 N.Y.S.2d 232, 236, 448 N.E.2d 86 (1983). "New York sets a high threshold for conduct that is 'extreme and outrageous' enough to constitute intentional infliction of emotional distress." *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir.1996). Indeed, apparently as of 1993, the New York Court of Appeals has never upheld a claim for intentional infliction of emotional distress. *See id.* at 791; *Howell v. New York Post Co., Inc.*, 81 N.Y.2d 115, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993).

In the present case, the plaintiffs allege only that Weisel and Lorrie Weisel sustained severe emotional distress as a result of the illegal and extremely outrageous conduct of Pischel, Ameri–Swiss, and Bierman. The plaintiffs do not clarify which specific acts support this claim. Nor do the plaintiffs expound upon their individual injuries. However, more to the point, it cannot be said that Pischel and Ameri–Swiss' conduct meets the threshold standard of outrageousness transcending the bounds of decency. The Court holds that their conduct was not so extreme in degree as to be intolerable in a civilized society as a matter of law. *See Natoli v. City of Kingston*, 195 A.D.2d 861, 862, 600 N.Y.S.2d 780, 781 (3d Dept.1993). Accordingly, the Court grants the motion for summary judgment by the defendants Pischel and Ameri–Swiss dismissing count nine, the plaintiff's claim of intentional infliction of emotional distress.

### III. CONCLUSION

Having reviewed the parties submissions and having granted them, including the plaintiffs' counsel, the opportunity for oral argument, it is hereby

**ORDERED**, that the plaintiffs motion to vacate their default in answering the defendants' three counterclaims is **GRANTED**; and it is further

**ORDERED**, that defendants Pischel and Ameri–Swiss' motion for summary judgment is **GRANTED** to the extent that the first, second, third, and fourth, causes of action, asserting claims under 18 U.S.C. §§ 1962(b),

1962(c), and 1962(d), and the ninth cause of action, asserting a claim of intentional infliction of emotional distress are dismissed with prejudice, and it is further

**ORDERED**, that counsel for all parties are directed to select a jury on Monday, November 6, 2000, at 9:00 a.m.

**SO ORDERED.**